UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JOHN STILES, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No.: 1:21-cv-00497-MSM-LDA ) |
| BROWN UNIVERSITY, | ) ) |
| Defendant. | ) ) |

**MEMORANDUM IN SUPPORT OF**
**JOHN STILES' EMERGENCY MOTION FOR INJUNCTIVE RELIEF**

Plaintiff John Stiles ("John") requests a temporary restraining order and preliminary injunctive relief against Defendant Brown University ("Brown") on the basis that his contract with Brown gives him procedural and substantive rights to participate in all academic and extracurricular activities. However, Brown has summarily removed John from campus and suspended him pending resolution of a Title IX complaint solely on the basis of the allegations and before Brown has conducted any investigation of the complaint. This irregular and precipitous action has caused imminent irreparable harm to John's education and professional career goals, as well as emotional and reputational harm for which no adequate legal remedy exists.

**FACTUAL BACKGROUND**

John is a senior at Brown, a member of the Lacrosse team, and the accused in a pending Title IX complaint. (Para. 1).[1] On November 18, 2021, Jane Roe, a female freshman at Brown, filed a Title IX complaint against John "with the express purpose to have [John] expelled from Brown without conferral of his bachelor's degree." (Para. 9). The following day, Brown suspended John. (Para. 10). On November 30, 2021, John appealed his interim suspension to Vice President Eric Estes. (Para. 11). In conjunction with his appeal, John also submitted his response

---

[1] All paragraph references herein are to John's Verified Complaint filed on December 17, 2021 (ECF #1).

to the Title IX complaint to Mr. Estes.  (Para. 12).  On December 6, 2021, Mr. Estes partially granted John's appeal by allowing him to complete the current semester remotely and remanded the question of John's suspension for the Spring semester to Brown's threat assessment team for renewed consideration based on John's response to the Title IX complaint.  (Para. 13).  On December 10, 2021, the threat assessment team affirmed their conclusion that John's "Prohibited conduct was likely to continue" as well as Mr. Estes' decision that John should be suspended beginning on January 7, 2022, pending an investigation and resolution of the Title IX complaint.  (Para. 14).

The basis of Jane's Title IX compliant was a sexual encounter on October 30, 2021.  (Paras. 26, 35).  This was not the first intimate encounter between John and Jane.  (Paras. 17, 22).  They met at an off-campus party on October 16, 2021.  (Para. 17).  Although John and Jane were unacquainted, Jane took the time to seek John out at the party and talk to him.  (Para. 18).  Initially, John tried to get Jane to talk to his friend as his friend had expressed interest in Jane and the two had talked before.  (Para. 19).  But, Jane continued to talk and direct her attention to John.  (Para. 19).  Toward the end of the party, John and Jane left the party together and went to John's house.  (Para. 20).

At John's house, John and Jane had active, consensual sex and Jane spent the night with John.  (Para. 22).  The following morning, John and Jane tried to have sex again, but Jane said that she was too sore and therefore suggested maybe later that day or that night.  (Para. 23).  John respected Jane's decision.  (Para. 23).  Later in the day, Jane told John she was still feeling sore.  (Para. 24).  John again accepted Jane's decision without question, and the two did not meet up again that day and instead mutually continued to see if there were other times through the week to meet up.  (Para. 25).

Approximately two weeks later, on October 30, 2021, John and Jane saw each other at another off-campus party. (Paras. 25-26). Jane told her friend that she would "only go home if it's with [John]." (Para. 26). John and Jane talked like they had two weeks prior, and eventually, John asked Jane if she wanted to leave. (Para. 27). Jane agreed. (Para. 27). At John's house, the two went into John's room. (Para. 29). There, they continued talking and eventually began kissing, touching, and undressing. (Para. 29). The kissing and touching progressed to fellatio. (Para. 30).

When Jane stopped performing oral sex, John asked if Jane wanted to have intercourse. (Para. 32). Jane said yes. (Para. 32). Before intercourse began, John got up from the bed, went over to a shelf to retrieve a condom and put it on. (Para. 33). Jane waited on the bed. (Para. 33). After John put on the condom, he asked Jane if she wanted him to use lube. (Para. 34). Jane said yes. (Para. 34). So, John retrieved the lube from the shelf and proceeded to put it on his penis and Jane's vagina. (Para. 34). The couple started out in missionary position and then changed positions a few times until they ended up on the edge of John's bed with Jane in control on top of John. (Para. 36). Jane got on top of John on her own volition because John could not just pick her up and place her there. (Para. 37). After some time, John wrapped Jane's legs around him as she wrapped her arms around John's neck so the couple could continue intercourse in a standing position. (Para. 39). On and off throughout the encounter, John and Jane kissed. (Para. 38). Then, at some point while standing, John felt a burst of liquid from Jane. (Para. 41). Something similar had happened the first time he and Jane had sex. (Para. 41). Jane did not say anything about it, and the two continued having sex. (Para. 41).

After John sat back down on the edge of the bed, face to face with Jane on top of him, he realized that the consistency and volume of liquid that he felt running down his thighs was not normal. (Para. 42). So, he said "hold on" and asked Jane to get off. (Para. 42). John did not

ejaculate during intercourse but stopped because he felt something was wrong. (Para. 43). John helped Jane off of him and went to turn on the light. (Para. 44). When he did, the couple saw a significant amount of blood. (Para. 44). The amount of blood took John aback and he was unsure what to make of it – Jane seemed physically okay despite the blood. (Paras. 46-47). Until John turned on the lights, she appeared to be enjoying the sex. (Para. 47).

John thought Jane's failure to mention her bleeding was bizarre and asked how this happened. (Para. 48). In response, Jane said maybe there was blood because she was still on her period as of the day before. (Para. 48). That Jane might have chosen to have sex without telling him she had just finished her period disturbed John. (Para. 49). He asked Jane why she did not tell him. (Para. 49). Jane responded by asking why she should tell John that. (Para. 49). To John, the answer was obvious. (Para. 49). Period sex can be bloody and messy, and in fact, John's bedding was ruined. (Para. 49). John and Jane continued to argue about whether Jane should have told John she just ended her period. (Para. 50). John disagreed with Jane's view that it was none of his business. (Para. 50). He blamed Jane for the incident and said the bloody mess was disgusting. (Para. 50). Jane understood John to say that she was disgusting. (Para. 51). After that, John left the room to get cleaning supplies. (Para. 52). Meanwhile, Jane waited in John's room for him to return. (Para. 52).

When John got back, he told Jane she should shower due to the blood. (Para. 53). Initially, John gave Jane time alone in the bathroom. (Para. 54). A few minutes later, he entered the shower with Jane, as the two had showered together after the first time they had sex. (Para. 54). In the shower, the tension between John and Jane persisted. (Para. 55). They continued to argue about whether it was okay to have sex so soon after Jane's period without her first mentioning that detail. (Para. 55). John and Jane did not argue the whole time in the shower, but the situation was uncomfortable, and John tried to make lighthearted comments and laugh at the absurdity of the

situation. (Para. 56). Jane seemed receptive. (Para. 56). Before exiting the shower, John noticed that Jane was still bleeding and that the blood did not look like period blood. (Para. 57). He mentioned this to Jane and told her she should get checked out. (Para. 57). Jane, however, did not appear to be in pain or say she was. (Para. 57).

After the shower, John and Jane returned to John's room, cleaned up the blood, and John stripped the sheets and blanket from the bed. (Para. 58). Due to the amount of blood, John threw the bedding out the window into a dumpster directly below. (Para. 58). John was irritated that his bed now had no blanket or sheets. (Para. 59). Jane then asked John if she could borrow a pair of his shorts. (Para. 59). John replied that most of his shorts were dirty, and thinking it reasonable for Jane to go home in the same clothes she arrived in, he told her the ones he had he needed to keep. (Para. 60). Then, around 3:00 AM, John walked Jane back to her dorm, which was a good distance away. (Para. 63). As John and Jane walked, they chatted relatively amicably. (Para. 64). They talked about John's post-graduation plans and, as they neared Jane's dorm, Jane told John that he should try to respond differently in the future in the event of unexpected bleeding during sex. (Para. 64). John agreed. (Para. 64).

The next morning, Jane sent John a text message saying she had a cut inside her vagina. (Para. 65). John responded that he hoped she was okay. (Para. 65). That afternoon, Jane had lunch with some of her teammates. (Para. 66). She told them about the bleeding during intercourse but made no accusations against John. (Para. 66). Later that night, Jane sent John the following message:

> You fucking asshole. Humiliated me, made me feel like shit, made me think it was my fault . . . and turns out it had NOTHING to do w my period thank you. you fucking cut me. went to the doctor. and then on top of that, you made me wear my own damn shorts back home which hurt like hell bc "i was too 'disgusting' to wear anything of yours." Fuck you.

(Para. 67). Jane's representation in her message that she had already seen a doctor was not true. (Para. 68). Though Jane was plainly angry at John for a lot of things and listed them, from how he made her feel down to his not lending her his shorts, she made no mention of rape or assault. (Para. 69). Upon receiving Jane's message, John replied multiple times in short succession because he felt bad about his response to the situation and wanted Jane to know that. (Para. 70). John wrote:

> I am sorry. I knew it wasn't your period and I said I believe you were cut. But yes I am sorry. I was an asshole
>
> Truly sorry
>
> Please open this so I know you got it. Again, I'm sorry.

(Para. 70). That was last time John ever heard from or contacted Jane. (Para. 70). It was October 30, 2021. (Para. 70).

A few days later, Wednesday, November 3, 2021, was Jane's ROTC day, which meant she needed to wear her military uniform. (Para. 71). However, due to Jane's discomfort, she could not put the uniform on. (Para. 71). With the help of a fellow ROTC friend, Jane obtained permission to wear sweatpants. (Para. 71). Later that day, the same friend asked Jane if she had been sexually assaulted. (Para. 72). In response, Jane claims that she broke out in tears. (Para. 72).

The next day, November 4, 2021, the ROTC friend approached Jane again and asked her to talk to her mother on the telephone. (Para. 73). The friend's mother was a nurse and, together, the friend and her mother "convinced" Jane to go to the health care center because she was still bleeding. (Para. 73). According to Jane, the doctor at the health care center told her that she had tearing, bruising, and swelling, and that if she wanted she could go to the emergency room for a SANE (sexual assault nurse examiner) exam. (Para. 74). Jane declined, but later the same day, she accused John of sexual assault for the first time before her coaches and trainer. (Para. 75). They, in turn, filed a Title IX report. (Para. 75).

Two weeks after her coaches filed their Title IX report, Jane filed her complaint. (Para. 76). In it, she claimed that John committed "sexual assault in the first degree (rape)" against her and stated it was her "express purpose to have the Respondent [John] expelled from Brown without conferral of his bachelor's degree." (Paras. 77-78). Jane alleged that John demanded oral sex until she obliged, and then forcefully penetrated her throat and would not let her go. (Para. 79. Jane further claimed:

> He then flipped me over to penetrate me vaginally with his penis. I was tense, rigid, and not in a state of arousal. The forceful penetration hurt instantaneously. I explicitly said to him "Please stop." He willfully ignored me and continued to rape me.

(Para. 80). She made no mention of John's asking if she wanted to have sex, retrieving a condom and lube, or their multiple sex positions. (Para. 81). Instead, she claimed that she was "fearing for [her] life" and "had no choice but to wait out the assault." (Para. 81). After John and Jane discovered the blood, Jane claimed that John was "raging," that he might have pushed her forcefully into the wall but could not remember for sure, and that she was "so scared [she] was shaking," realized she was "not safe at all" and "needed to find a way to get out." (Para. 82). Nonetheless, John left her alone twice and, in both instances, Jane chose to stay, take a shower, help John clean up, and ask him for a pair of shorts before walking home with him. (Para. 82).

As for John's recollection, he did not hear Jane say "please stop" at any point. (Para. 83). He heard her make small comments of "yes" and "keep going," but did not hear any "please stop." (Para. 83). If she had said "please stop," John would have heard it, and he was fully in control of himself and able to stop before ejaculation, as he eventually did once he suspected something was amiss. (Para. 83).

The day after Jane filed her complaint, Brown summarily suspended John on November 19, 2021. (Para. 85). Though Brown never misses an opportunity to tell John that it "remains committed to supporting you," in reality, it has done little to help him. (Para. 84). Because John

was suspended, he could not attend classes or hand in assignments. (Para. 86). On December 6, 2021, the Fall semester interim suspension was replaced with a removal from campus and remote learning requirement.[2] (Para. 87). The next day, John received an email that his student status had been reactivated. (Para. 88). However, John had missed the last 17 days of class and lectures and now had to catch up and arrange to take exams immediately. (Para. 87).

The next day, on December 8, 2021, at 5:52 PM, John was informed that, "after deliberation and consulting the Dean," it was decided he would have to take one of his exams the next morning at 11:00 AM because that was the only virtual sitting. (Para. 89). At 6:22 PM, John replied to the message stating the unfairness of the situation and asking if there was truly no other option, but he received no response. (Para. 90). In a panic, John reached out to the support dean who had talked to the teacher, explained his predicament, the fact that he had had no school resources or ability to follow classes for the past 17 days, and now had only 17 hours to prepare for his exam. (Para. 91). Again, John received no reply. (Para. 91). At 9:34 PM, John emailed another dean asking for help. (Para. 92). Once again, he received no reply. (Para. 92).

On December 9, 2021, one hour and 14 minutes before John's scheduled exam, his support dean finally replied. (Para. 93). The dean said he understood John's reluctance and referred him to Assistant Vice President Koren Bakkegard. (Para. 93). John immediately emailed and called the Assistant Vice President. (Para. 94). Twenty minutes before the exam was to start, John learned from Ms. Bakkegard that he would be allowed to take his exam on a different day in person. (Para. 94).

For another class, John had a paper worth fifteen percent of his final grade due the day he was suspended. (Para. 95). Because of his suspension, John was unable to submit the paper.

---

[2] The Spring semester interim suspension was left untouched. (Para. 14).

(Para. 96). In trying to catch up and remedy the situation, John emailed the professor, who replied that he would not excuse the lateness as Brown decided the delay was not excused. (Para. 96). In addition, at least one of John's lecture-based classes does not offer any way to review material from missed lectures other than possibly borrowing fellow classmates' notes. (Para. 97). Because of this and the interim suspension, John may well fail some of his classes due to the fact that much of the content on the exams will be based on lectures that John was not allowed to attend or papers and work that were deemed late without excuse. (Para. 98).

Throughout this ordeal, John has been advised of academic decisions at the last minute and without prior timely communication with him, thereby adding stress about failing classes to his anxiety about being wrongly accused of sexual assault. (Para. 99). The support Brown has repeatedly promised John simply has not been forthcoming. (Para. 100).

## LEGAL STANDARD

A preliminary injunction is appropriate in order to "preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." *CMM Cable Rep., Inc. v. Ocean Coast Prop., Inc.,* 48 F.3d 618, 620 (1st Cir. 1995). In order to obtain a preliminary injunction, the moving party bears the burden of showing that: (1) he will suffer irreparable injury if the injunction is not granted; (2) such injury outweighs any harm which granting injunctive relief would inflict on the nonmovant; (3) he has a likelihood of success on the merits; and (4) the public interest will not be adversely affected by the granting of the injunction. See *Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 5 (1st Cir. 1991); *Hasbro, Inc. v. MGA Entm't Inc.,* 497 F. Supp. 2d 337, 340 (D.R.I. 2007). The following addresses each of these elements in detail.

**DISCUSSION**

I.    <u>John has shown a reasonable likelihood of success in demonstrating breach of his contract with Brown.</u>

A plaintiff need not demonstrate an irrebuttable or even a particularly strong chance of success on the merits. "While plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits, they 'need not show a certainty of success.'" *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); see also *The Fund for Community Progress v. United Way of Southeastern New England*, 695 A.2d 517, 521 (R.I. 1997) ("We do not require a certainty of success…. Instead we require only that the moving party make out a prima facie case"). Thus, John may meet this relatively low bar by proffering evidence that, if believed, would support each element of his claim. The elements of an action for breach of contract are the existence of a contract, breach of that contract, and damages flowing from the breach. See *Petrarca v. Fidelity and Cas. Ins. Co.*, 884 A.2d 406, 410 (R.I. 2005).

    A.  *John's relationship with Brown is contractual and incorporates the Student Conduct Procedures and Sexual Misconduct Procedure.*

Numerous jurisdictions, including Rhode Island, have concluded that the relationship between student and university is contractual in nature. See *Gorman v. St. Raphael Academy*, 853 A.2d 28, 34 (R.I. 2004). In *Mangla v. Brown University*, this Court stated, "[t]he student-college relationship is essentially contractual in nature." *Mangla v. Brown University*, 135 F.3d 80, 83 (1st Cir. 1998). "The terms of the contract may include statements provided in student manuals and registration materials." *Id.*, citing *Lyons v. Salve Regina College,* 565 F.2d 200, 202 (1st Cir. 1977) (construing College Manual and Academic Information booklet as terms of a contract between a student and college). Moreover, "[t]he proper standard for interpreting the contractual terms is that of 'reasonable expectation – what meaning the party making the manifestation, the

university, should reasonably expect the other party to give it.'" *Id.*, quoting *Giles v. Howard University,* 428 F. Supp. 603, 605 (D.D.C. 1977).

In the fall of 2021, Brown offered John re-enrollment in the Class of 2022. (Para. 7). As part of his enrollment, Brown required John's compliance with its school policies, including the 2021-2022 *Student Conduct Procedures* and *Sexual and Gender-Based Misconduct Complaint Procedure* (the "*Sexual Misconduct Procedure*"), which policies also afford John certain rights. (Paras. 102-03). John accepted Brown's offer and paid Brown tuition. (Paras. 7-8). Brown accepted John's tuition payments and enrolled him in classes. (Paras. 7-8). Accordingly, John's acceptance of Brown's offer of enrollment, payment of tuition and enrollment in classes created a contract between him and Brown, the terms of which are set forth, among other places, in the *Student Conduct Procedures* and *Sexual Misconduct Procedure.*

> B.  *Brown breached its contract by denying John his right to be presumed not responsible, denying him meaningful participation in an important phase of the Title IX process, imposing grave interim measures without investigation or "reasonable cause," failing to consider the significant and unreasonable burden a postponement of John's graduation will cause, and failing to provide him adequate academic support to allow him to continue his studies while this matter is pending.*

As a member of the Brown community, John reasonably expected that Brown and he were equally bound by the *Student Conduct Procedures* and *Sexual Misconduct Procedure*. (Paras. 102-03). Brown guaranteed John certain contractual rights by way of these policies. (Para. 103). In pertinent part, the *Student Conduct Procedures* entitle John to, *inter alia*, "not be presumed responsible of any alleged violations unless so found through the appropriate student conduct hearing" and to be "afforded an opportunity to offer a relevant response." (Para. 104). The *Sexual Misconduct Procedure* also "presumes that the Respondent is not responsible for the alleged Prohibited conduct" and further guarantees John "meaningful opportunities to participate" in the Title IX process. (Para. 105). This reasonably includes any important phase of the process that

will affect John's rights, such as his continuing education, access to campus, or participation in lacrosse. Finally, the *Sexual Misconduct Procedure* permits the "interim actions" of emergency removal from campus and suspension pending resolution of a complaint only if "there is reasonable cause to believe that the Prohibited Conduct is likely to continue and/or the Respondent poses a significant threat of harm to the health, safety, and welfare of others or the University community." (Para. 106). Brown has breached all of these provisions.

To begin, Brown failed to afford John his right to be assumed "not responsible" for the alleged violation against Jane because it removed him from campus and suspended him before performing any investigation of Jane's complaint. (Para. 108). It did not even wait for John to respond to the complaint, which denied John meaningful participation in an important phase of this process as well as all school resources and the ability to follow classes for 17 days at a critical time in the semester. (Paras. 87, 113). Brown's promises of support in that regard have proven empty. (Para. 100). Absent some level of investigation, Brown could not fairly determine if there were "reasonable cause to believe" that John would likely continue his alleged Prohibited Conduct. The conclusion that he was, therefore, is arbitrary because it is based solely on the accusations against him and takes no account of the fact that John has never attempted to contact Jane since he responded to her message on October 30, 2021, and has a good disciplinary record spanning nearly four years at Brown. (Para. 110).

In addition to the foregoing, the *Sexual Misconduct Procedure* states that interim actions are intended to be "restorative (designed to address a Complainant's safety and well-being and continued access to educational opportunities) and remedial (involving action against a Respondent without unreasonably burdening a Respondent.)" (Para. 107). Yet, John's removal from campus and interim suspension will cause him to be unable to graduate on time or play varsity lacrosse, and may cost him a job opportunity this summer. (Para. 111). It therefore constitutes a

significant burden which is not counterbalanced by any evidence of ongoing risk to Jane or the Brown community and is a further breach of Brown's contractual obligations to John.

      C. *John has suffered and will continue to suffer substantial damages as a result of Brown's breaches of John's contractual rights.*

John's initial interim suspension has already denied him 17 days of educational instruction at a critical time in the semester. (Para. 87). As a result, he is now scrambling to catch up and prepare for exams. (Para. 87). His success will now depend in part on the goodwill of classmates because at least one of John's lecture-based classes at Brown does not offer any way to review material from missed lectures. (Para. 97). When Brown promised John support, that is not what he expected, and the result is likely to be a poorer showing on grades than he otherwise would have had. (Para. 98). Some of this is already inevitable because one paper which accounts for fifteen percent of John's final grade has been deemed late without excuse, though the interim suspension is the cause of the lateness. (Paras. 95-96).

In addition to the negative impact on John's academic performance, John will no longer graduate on-time come May because Brown intends to reimpose the interim suspension on January 7, 2022. (Paras. 14, 111). This fact may endanger the job offer John has accepted beginning this summer, and at a minimum will require John to offer the employer an explanation. (Para. 15). The need to explain the facts set forth in John's verified complaint to a new employer will tarnish John's reputation and potentially limit his future prospects with the employer. Moreover, the gap on John's transcript will probably be noticed by other potential employers or graduate schools should John change his future plans. When they inevitably inquire about the gap, John's explanation could factor into employment or admissions decisions.

Lastly, John is a member of the varsity lacrosse team at Brown. (Para. 111). Lacrosse is a Spring semester sport. It is a sport John has practiced for years with notable success. Because

of COVID, John has been unable to participate in varsity lacrosse competition for the past two years. He is now at the pinnacle of his lacrosse career, and if he is not reinstated for the Spring semester, he may end up playing only one full year of varsity lacrosse at Brown. Based on the foregoing, Brown's actions have and will continue to cause John significant damages. Thus, there is a reasonable likelihood that John's breach of contract claim will meet success.

II.  <u>John will suffer irreparable harm if injunctive relief is not granted.</u>

Monetary damages will not adequately compensate John for the harms he will suffer if injunctive relief is not granted. At stake are John's education and right to continue, timely complete and obtain a Brown undergraduate degree, as well as participate in collegiate lacrosse, and retain a job offer he has accepted. (Para. 111). In sum, his academic, sports, and professional goals are at stake. The extent of these damages defy monetary quantification. This type of threatened reputational damage also has an emotional element. (Para. 121). This and the resulting loss of opportunities is "precisely the type of irreparable injury for which an injunction is appropriate." *The Fund for Community Progress*, <u>695 A.2d at 523</u>.

III.  <u>The balance of equities tilts to John because Brown will suffer no damage if relief is granted, and the public interest augurs in favor of upholding contractual rights.</u>

Against this clear threat of irreparable harm to John, very little is balanced on the other side of the scale. Sexual assault is to be adjudicated in accordance with a fair, standardized procedure, a procedure which – it must be said – retains value only so long as outcomes are not prejudged. By all accounts, the encounter between John and Jane started consensually. (Para. 32). John is not accused of random violence, and he never has been. (Para. 110). He has never attempted to contact Jane since responding to her message on October 30, 2021, even before the current no contact order entered. (Para. 70). That no-contact order is a less onerous alternative to removal from campus and interim suspension. It is already in place, and there is no evidence that it is

inadequate. (Para. 112). Moreover, John has a good disciplinary record spanning nearly four years at Brown. (Para. 110). Thus, at stake for Brown is little more than indiscriminate freedom of action in this disciplinary matter, a freedom it has expressly contracted away.

To be clear, John does not seek to stop the disciplinary process. Rather, he simply seeks the opportunity to substantively respond to and meaningfully participate in that process, while also continuing to participate in campus life, as is his contractual right, and avoiding irreparable harm to his future aspirations in the meantime. The cost to Brown will be little.

IV. <u>Injunctive relief is necessary to maintain the status quo</u>

This court possesses "broad discretionary power to take provisional steps restoring the status quo pending the conclusion of a trial." *Cohen v. Brown University*, 991 F.2d 888, 906 (1st Cir. 1993). The status quo is generally defined as "the last peaceable status prior to the controversy." *E.M.B. Associates, Inc. v. Sugarman*, 372 A.2d 508, 509 (R.I. 1977) citing 11A *Wright and Miller, Federal Practice and Procedure*, § 2948. In this case, the status quo is before John's November 19, 2021 interim suspension and removal from campus.

## CONCLUSION

For the reasons set forth herein, Plaintiff John Stiles respectfully requests that this Honorable Court restrain and enjoin Defendant Brown University from denying him his contractual rights under the *Student Conduct Procedures* and *Sexual Misconduct Procedure,* from suspending him pending resolution of Jane Roe's complaint, denying him class attendance and participation, and the ability to continue practicing and playing on the varsity lacrosse team until such time as he is found responsible for the alleged violations.

Dated: December 20, 2021

The Plaintiff, John Stiles,
By his Attorney,

/s/ J. Richard Ratcliffe
J. Richard Ratcliffe, #2603
Ratcliffe Harten Galamaga LLP
40 Westminster Street, Suite 700
Providence, RI 02903
Tel: (401) 331-3400
Fax: (401) 331-3440
rratcliffe@rhgllp.com

**CERTIFICATE OF SERVICE**

I, J. Richard Ratcliffe, certify that on December 20, 2021, this document was electronically filed through the Court's CM/ECF system and is available for viewing and downloading to all registered counsel of record.

/s/ J. Richard Ratcliffe