UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

JOHN STILES, a pseudonym,

v.                                                                   C.A. NO.: 21-cv-497-MSM-LDA

BROWN UNIVERSITY

**DEFENDANT BROWN UNIVERSITY'S
MEMORANDUM OF LAW IN SUPPORT OF ITS OBJECTION
TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

Defendant Brown University ("Brown" or the "University") opposes Plaintiff's motion for temporary restraining order and preliminary injunction for the below-stated reasons.

**BACKGROUND**

Plaintiff "John Stiles" is the respondent in an ongoing disciplinary case at Brown to address a formal complaint filed against him on November 18, 2021 by another undergraduate student (referenced in this litigation as "Jane Roe") under Brown's Sexual and Gender-Based Misconduct Policy. Jane Roe alleges that, during the early morning hours of October 30, 2021, Plaintiff sexually assaulted her through violence and force in his off-campus residence resulting in the infliction of physical injuries.

Brown is addressing Jane Roe's formal complaint under its Sexual and Gender-Based Misconduct Complaint Procedure, which states the University's process to investigate and resolve formal complaints alleging sexual misconduct proscribed by Brown's Sexual and Gender-Based Misconduct Policy. Both the Sexual and Gender-Based Misconduct Policy and its related Sexual and Gender-Based Complaint Procedure authorize Brown to conduct a threat assessment to

1

determine whether interim actions, including an emergency removal of a student, are warranted as the investigation and resolution processes ensue.[1]

In support of its opposition to Plaintiff's motion, Brown has concurrently filed declarations by Eric Estes (the University's Vice President for Campus Life) and Koren Bakkegard (the University's Associate Vice President for Campus Life and Dean of Students), which are incorporated herein.  As detailed in the declarations, Brown has established threat assessment procedures for reviewing and determining whether there is reasonable cause to believe that the prohibited conduct will continue and/or a Brown student poses a significant threat of harm to the health, safety, and welfare of others or the University community.

Under the Sexual and Gender-Based Misconduct Policy and its related Sexual and Gender-Based Misconduct Complaint Procedure, Brown's Threat Assessment Team convenes to evaluate its rubric of several risk factors.  If the Threat Assessment Team identifies risk factors and determines that an emergency removal of a student is warranted, it makes appropriate recommendations to Associate Vice President Bakkegard to avert the potential threat and maintain the safety of the University community.  Associate Vice President Bakkegard reviews the recommendation and decides whether to implement an emergency removal.  Brown may remove a student on an emergency basis with or without the completion of the complaint resolution process.  Emergency removals may be appealed to Vice President Estes. As detailed in the accompanying declarations, Brown completed this threat assessment review twice in relation to Jane Roe's allegations against Plaintiff.

---

[1]  Plaintiff's Verified Complaint alleges that Brown is administering his disciplinary case under its Student Conduct Procedures.  As confirmed in Associate Vice President Koren Bakkegard's declaration, Brown's Sexual and Gender-Based Misconduct Complaint Procedure applies to the ongoing disciplinary case and prescribes the process for its investigation and resolution.

Upon Brown's receipt of Jane Roe's formal complaint on November 18, 2021 alleging that she was sexually assaulted by Plaintiff through his use of violence and force and that she suffered resulting physical injuries, Brown's Threat Assessment Team convened on November 19, 2021, and applied its Threat Assessment Rubric. The Team concluded that the significant violence and force underlying the alleged conduct posed a risk to the University community, justifying Plaintiff's emergency interim suspension as an appropriate interim measure, pending the resolution of the formal complaint against him by the Title IX Office. Associate Vice President Bakkegard reviewed and concurred with the recommendation, and she notified Plaintiff of his interim suspension on November 19, 2021.

On November 30, 2021, Plaintiff submitted his appeal to Vice President Estes, which included his response to Jane Roe's allegations in her formal complaint. On December 2, 2021, Vice President Estes met with Plaintiff and his advisor of his choice (his legal counsel) to discuss his appeal and afford him a full opportunity to be heard. Vice President Estes determined that the Threat Assessment Team should reconvene and review the information provided by Plaintiff.

On December 6, 2021, Vice President Estes notified Plaintiff that, as a temporary measure, his interim suspension would be adjusted to an emergency interim removal from campus through the Fall 2021 semester and the submission of final course grades on January 6, 2022, with the interim suspension taking effect on January 7, 2022. Vice President Estes made this modification to allow John to complete the Fall 2021 semester remotely, to the extent each of his professors would allow him to do so, pending the Threat Assessment Team's further review.

Pursuant to Vice President Estes' instruction, the Threat Assessment Team reconvened to review the information provided by Plaintiff and was also aware of a state court order entered against Plaintiff. The Threat Assessment Team concluded that the interim action, as modified by

Vice President Estes, was an appropriate response to protect the safety of the community. Associate Vice President Bakkegard reviewed and concurred with the recommendation. On December 10, 2021, Associate Vice President Bakkegard notified Plaintiff of her decision. Also, as a one-time exception, Vice President Bakkegard allowed Plaintiff to access the campus on December 15, 2021 for the sole purpose of taking a final examination that could not be completed remotely.

Initially, Plaintiff did not file an appeal to Vice President Estes. Instead, he filed this lawsuit on December 17, 2021. During a January 6, 2022 status conference with the Court, Plaintiff indicated that he would file an appeal to Vice President Estes, which he did on January 10, 2022. During the afternoon of January 11, 2022, Vice President Estes met with Plaintiff and his advisor (his legal counsel). Vice President Estes afforded Plaintiff the opportunity to be heard, ask questions, and confer privately with his advisor (if he wished to do so). Based upon his review of Plaintiff's appeal and all relevant records, Vice President Estes determined that there is reasonable cause to believe that Plaintiff poses a significant threat of harm to the health, safety, and welfare of others or the University community and that the interim suspension should remain as instituted.

As detailed factually in the accompanying declarations and argued as a matter of law below, Brown applied its emergency removal and threat assessment process consistently with the provisions of the Sexual and Gender-Based Misconduct Policy and its related Sexual and Gender-Based Misconduct Complaint Procedure and in accordance with a student's reasonable and objective expectations of the policies and procedures. Plaintiff is before the Court because he disagrees with the result of Brown's threat assessment process and his interim suspension, but it is not the Court's role to serve as an appellate body to review Brown's assessments of campus

4

community risks and appropriate responsive measures. Plaintiff has not shown a likelihood of success on the merits.

Regarding Plaintiff's alleged irreparable harm, he has pled that his education will be delayed, that he will be unable to participate in his varsity sport this season, and that he believes that he may lose an unspecified job this summer. As detailed below, courts nationally have rejected similar arguments contending irreparable harm, finding that, if a plaintiff can ultimately prove his case, the student has an adequate remedy at law through a damages claim. Plaintiff has not shown irreparable harm.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (internal quotations omitted). To determine whether to grant a preliminary injunction, the Court considers four well-established prongs:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 15 (1st Cir. 1996) (citations omitted). "Likelihood of success is the main bearing wall of the four-factor framework." *Id.* at 16 (citations omitted). Without establishing a strong likelihood of prevailing on the merits as opposed to a mere possibility of success, the other prongs are irrelevant. *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012) (citation omitted). Plaintiff bears the burden that these factors weigh in his favor. *Nieves-Marquez v. P.R.*, 353 F.3d 108, 120 (1st Cir. 2003). The Court should not award the "extraordinary and drastic remedy" of a preliminary injunction unless

Plaintiff meets his high burden of persuasion with "substantial proof." *Marzurek v. Armstrong*, 520 U.S. 968, 972 (1997).

The Court should be especially cautious when a party seeks an injunction to alter an ongoing disciplinary process at a private university. "[C]ourts are chary about interfering with academic and disciplinary decisions made by private colleges and universities." *Doe v. Trs. of Bos. Coll.*, 942 F.3d 527, 535 (1st Cir. 2019) (quoting *Schaer v. Brandeis Univ.*, 432 Mass. 474, 735 N.E. 3d 373, 381 (2000)); *see also Guckenberger v. Bost. Univ.*, 974 F. Supp. 106, 150-51 (D. Mass. 1997) ("[C]ourts should be slow to intrude into the sensitive area of the student-college relationship, especially in areas of curriculum and discipline.") (internal citations omitted).

The Court does not have to determine what happened between Jane Roe and Plaintiff, whether it would make the same judgment calls on the evidence as made by university administrators, or whether the disciplinary procedure was optimal. *Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 313 (D.R.I. 2016). "This Court is not a super-appeals court for sexual misconduct cases, nor is it an advisor to Brown on how it should handle these messy and unfortunate situations." *Id*. "To be perfectly clear, a student is not entitled to a perfect disciplinary process, and it is not the Court's role to be an appeals court for Brown's disciplinary decisions. Nor is it the case that any minor technical violation entitles a student to a new disciplinary hearing or a review by this Court." *Id.* at 331. Further, "[i]t is not the Court's role to reevaluate [a university administrator's] discretionary calls so long as they are not against any of the explicit provisions of the contract or patently unreasonable." *Id*. at 338 (citing *Schaer*, 432 Mass. at 481, 735 N.E.2d at 373).

Plaintiff's Verified Complaint does not request the Court stop the University's ongoing disciplinary process, which Brown is authorized to conduct under its policies and procedures.

6

Rather, Plaintiff wants the Court to overturn Brown's threat assessment determination, vacate the interim suspension, and order his reinstatement. Essentially, Plaintiff seeks at the preliminary injunction stage that the Court enter the ultimate and entire equitable relief sought by his Verified Complaint. *See SW Industries v. Aetna Cas. & Sur. Co.*, 646 F. Supp. 819, 823 (D.R.I. 1986) ("Preliminary injunctions of a mandatory nature are particularly disfavored when their effect would be to grant the ultimate relief sought by the moving party.").

## ARGUMENT

I.  **Plaintiff is unlikely to succeed on the merits.**

   A.  **The Court has recognized the judicial deference that must be shown to a university's administration of an educational contract with its students.**

In *Doe v. Brown University*, the Court detailed the legal analysis applicable to a claim alleging a breach of an educational contract:

> To prevail in a breach of contract claim, "a plaintiff must prove that (1) an agreement existed between the parties, (2) the defendant breached the agreement, and (3) the breach caused (4) damages to the plaintiff." *Barkan v. Dunkin' Donuts, Inc.*, 627 F.3d 34, 39 (1st Cir. 2010) (citing *Petrarca v. Fid. & Cas. Ins. Co.*, 884 A.2d 406, 410 (R.I. 2005)). "To establish causation, the plaintiff must prove that the defendant's breach was the 'but for' cause of the alleged damages." *Id.* (citing *Wells v. Uvex Winter Optical, Inc.*, 635 A.2d 1188, 1191 (R.I. 1994)). "The relevant terms of the contractual relationship between a student and a university typically include language found in the university's student handbook." *Havlik* [*v. Johnson & Wales Univ.*], 509 F.3d [24, 34 (1st Cir. 2007)] (citation omitted). Rhode Island courts interpret the terms of a student handbook "in accordance with the parties' reasonable expectations, giving those terms the meaning that the university should reasonably expect the student to take from them." *Id.* (citing *Mangla v. Brown Univ.*, 135 F.3d 80, 84 (1st Cir. 1998). Any "[a]mbiguities in a contract must be construed against the drafter of the document," *Haviland v. Simmons*, 45 A.3d 1246, 1259-60 (R.I. 2012), which in the case of a student handbook is the university.
>
> However, "[b]ecause contracts for private education have unique qualities, we must construe them in a manner that leaves the school administration broad discretion to meet its educational and doctrinal responsibilities." *Gorman v. St. Raphael Acad.*, 853 A.2d 28, 34 (R.I. 2004); *see also Schaer v. Brandeis Univ.*, 432 Mass. 474, 735 N.E. 2d 373, 381 (2000) ("[C]ourts are chary about interfering with academic and disciplinary decisions made by private colleges and universities. . . . 'A college

7

> must have broad discretion in determining appropriate sanctions for violations of its policies.'" (quoting *Coveney v. President & Trustees of the College of the Holy Cross*, 388 Mass. 16, 445 N.E.2d 136, 139 (1983)). Therefore, the rules set out in a university's handbook are "enforceable as long as [they are] not against public policy or law." *Gorman,* 853 A.2d at 39. A rule "violates public policy only if it is: '[1] injurious to the interests of the public, [2] interferes with the public welfare or safety, [3] is unconscionable; or [4] tends to injustice or oppression.'" *Id*. (quoting *City of Warwick v. Boeng Corp.*, 472 A.2d 1214, 1218 (R.I. 1984)). Courts may also "provid[e] a judicial remedy to members of private voluntary organizations aggrieved by the arbitrary and capricious application of otherwise reasonable rules by the officers of those organizations*.*" *King v. Grand Chapter of Rhode Island Order of E. Star*, 919 A.2d 991, 998 (R.I. 2007).

210 F. Supp. 3d at 330-31.

Applying this framework, the Court concluded in *Doe* that "[t]here are three broad questions the Court must answer," which Brown will apply to this case and analyze below:

1) Whether Brown's rules and procedures, on their face, violate public policy or the law;

2) Whether Brown violated any of the specific terms of its contract and/or applied its rules arbitrarily and capriciously;

3) If there was a breach of contract, whether that breach caused the student's damage.

*Id*. at 331.

Regarding the first question, Plaintiff has not challenged the legality of Brown's policies, particularly the Sexual and Gender-Based Misconduct Policy and its related Sexual and Gender-Based Misconduct Complaint Procedure (the two controlling policies in Plaintiff's disciplinary case). "Brown, as a private university, has ample discretion in designing its disciplinary process; the Court may only intervene if the process violates public policy or the law." *Id*. at 332 (citing *Gorman*, 853 A.2d at 39). That was not the case in *Doe*, nor is it the case here. Skipping to the third question, Brown strongly denies that it has breached any contractual obligation to Plaintiff. Regardless, even if Plaintiff could make such a showing, he has not established irreparable harm to compel an immediate preliminary injunction.

8

The second question is the focus here: whether Plaintiff has shown that Brown violated any terms of his educational contract or applied the contract in an arbitrary or capricious manner. Brown has applied its policies in accordance with their stated procedures and exercised its decision-making authority within its institutional discretion.

**B.     Plaintiff has not shown any procedural violation in Brown's application of its policies**.

As detailed in Brown's accompanying declarations, Brown's Sexual and Gender-Based Misconduct Policy and its related Sexual and Gender-Based Complaint Procedure authorize Brown to consider the appropriateness of an "Interim Action," including an "Emergency Removal."  Under the threat assessment process, the Threat Assessment Team first determines "whether there is reasonable cause to believe that the Prohibited Conduct is likely to continue and/or the Respondent poses a significant threat of harm to the health, safety, and welfare of others or the University community."  If the Threat Assessment Team determines that an emergency removal is warranted, it will recommend such an interim action to the Associate Vice President for Campus Life, who will determine whether to implement the student's emergency removal.  If the Associate Vice President imposes an emergency removal, the student may appeal the decision to the Vice President of Campus Life.

The University implemented and followed this process twice – first upon its receipt of Jane Roe's formal complaint raising serious allegations of sexual misconduct that involved force and violence and imposed physical injuries and upon Plaintiff's submission of information in his defense.  The University's process has been conducted in accordance with a student's reasonable expectations, so there is no basis for a breach of contract claim asserting any procedural error.

Further, even where procedural error is found that substantially affected the outcome of a decision in the University's process (which Brown strongly denies), the sole judicial remedy is a

9

remand back to the University to conduct the process again, with any alleged deficiencies corrected, as the Court concluded in *Doe*. 210 F. Supp. 3d at 313, 346-47. *Doe* involved a breach of contract claim by a student alleging procedural errors in a disciplinary proceeding that found him responsible for sexual misconduct, and Judge Smith held, after a bench trial on the merits, that "the [determined] procedural errors likely affected the panel's decision . . . [a]ccordingly, Doe is entitled to a new hearing that remedies these infirmities." *Id*. at 313. The Court emphasized that it is not the Court's role to pass judgment on whether the outcome of the disciplinary process that found Doe responsible was wrong – that was "for a Brown panel to decide if [Brown] chooses to [re-]present the matter after correcting the errors cited." *Id*. at 313 n.2; *id*. at 336 ("To be very clear, the Court is not in any way suggesting that it would be an error for a new panel to find Doe responsible. And if a new panel is convened and it finds him responsible, its finding will be binding (assuming no other contract violations occur) irrespective of this Court's conclusion."). Again, Brown maintains that it properly conducted its threat assessment process and has made no procedural errors in the ongoing disciplinary proceedings to address Jane Roe's sexual misconduct complaint against Plaintiff. Even, assuming *arguendo*, that a procedural error is found by the Court at this preliminary injunction stage, consistent with *Doe*, the matter must be remanded back to Brown, where the determination impacting the health and safety of Brown's campus and community (here, a threat assessment) should be made by the University.

**C.   Brown has not applied its educational contract with Plaintiff in an arbitrary and capricious manner.**

The crux of Plaintiff's breach of contract claim seems to be his contention that there is not "reasonable cause to believe" that he will likely continue the alleged prohibited conduct in Jane Roe's formal complaint and/or he poses a significant threat of harm to the health, safety, and welfare of others or the University community. Plaintiff seeks to transform this Court into a "super

10

appeals" board to challenge to the merits of the Threat Assessment Team's recommendation to Associate Vice President Bakkegard, the Associate Vice President's review of the recommendation and determination of appropriate interim actions, and the Vice President for Campus Life's consideration and determination of the appeals. Plaintiff seeks to build another layer of appeal, by asking the Court to judge the merits of Brown's decision, which is not the Court's role.

As stated in *Doe,* Plaintiff must show that Brown acted in an "arbitrary and capricious" manner, in concluding that Plaintiff should be placed on an interim removal from campus through the end of the Fall 2021 semester and the submission of final semester grades on January 6, 2022 and should be placed on an interim suspension effective on January 7, 2022. 210 F. Supp. 3d at 331 ("Courts may also 'provid[e] a judicial remedy to members of private voluntary organizations aggrieved by the arbitrary and capricious application of otherwise reasonable rules by officers of those organizations.'") (quoting *King v. Grand Chapter of Rhode Island Order of E. Star*, 919 A.2d 991, 998 (R.I. 2007)). As *Doe* emphasizes, "[i]t is not the Court's role to reevaluate [a university administrator's] discretionary calls so long as they are not against any of the explicit provisions of the contract or patently unreasonable." *Id*. at 338 (citing *Schaer*, 432 Mass. at 481, 735 N.E.2d at 373). In the context of an educational contract, courts have stressed the principle of judicial restraint and the heavy burden that a plaintiff bears to demonstrate arbitrary or capricious conduct. *See*, *e.g.*, *Madej v. Yale Univ.*, Civ. Case No. 3:20-cv-133 (JCH), 2020 WL 1614230, at *12 (D. Conn. Mar. 31, 2020) ("[Plaintiff] 'bears a heavy burden in showing that his withdrawal resulted from arbitrary or capricious action. To prevail, he must show that the [university's] decision had no 'discernable rational basis.'") (quoting *Gupta v. New Britain Gen. Hosp.*, 239 Conn 574, 596, 687 A.2d 111 (1996)).

Plaintiff was afforded opportunities to be heard by the University – through his submission on November 30, 2021 of his initial appeal and response to Jane Roe's formal complaint and again through his submission of his second appeal on January 10, 2022. During conferences with Vice President Estes held on December 2, 2021 and January 11, 2022, Plaintiff was afforded the opportunity to be heard, with his advisor (his attorney here) present and the opportunity to take breaks in the conferences to consult with his advisor if he chose. As stated in Vice President Estes' declaration, the University stands by its decision that an interim suspension is warranted, pending the completion of the process under the Sexual Misconduct and Gender-Based Complaint Procedure. Plaintiff's strong disagreement with the University's decision is insufficient to establish that Brown acted arbitrarily and capriciously, and he has not shown a likelihood of success on the merits.

**II.      Plaintiff has not established irreparable harm.**

Irreparable harm "constitutes a necessary threshold showing for an award of preliminary injunctive relief." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). "The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon" Plaintiff, and a "finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Id.*; *see also Ross-Simons of Warwick, Inc.*, 102 F.3d at 19 ("[T]he plaintiff's showing must possess some substance; a preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm."). In other words, Plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction," not just that it is "possib[le]." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original).

Critically, an injury is not irreparable simply because it could be remedied by an injunction. Rather, "'[i]rreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr, Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005).

### A. A delay in Plaintiff's anticipated completion of his undergraduate education and graduation date is not irreparable harm.

Many federal courts have concluded that a delay in a student's ability to take core academics or graduate by a planned date does not constitute irreparable harm to justify a preliminary injunction to alter a school's action in its internal disciplinary process. *See*, *e.g.*, *Doe v. Texas A&M Univ.*, Civ. A. H-20-4332, 2021 WL 257059, at *7-9 (S.D. Tex. Jan. 26, 2021) (denying a motion for a preliminary injunction where Plaintiff alleged that he would suffer irreparable harm absent injunction because he would be unable to complete his coursework by his planned graduation date, he would lose his status as a [university] student, and he would suffer harm to his future educational and employment prospects).[2]

In *Montague v. Yale Univ.*, the Connecticut Federal District Court denied a preliminary injunction motion filed by an expelled student-athlete:

> In this case, the court concludes that while Montague may suffer harm from his expulsion, he has not alleged irreparable harm warranting the imposition of a mandatory preliminary injunction. Montague argues that he will suffer irreparable harm from the delay in completing his education, not graduating with his contemporaries, and the possibility of decreased employment opportunities.

---

[2] In *Texas A&M*, the court acknowledged that the plaintiff would likely suffer an educational delay and resulting harm while the case was adjudicated on the merits, but such harm would be compensable in damages, if the plaintiff ultimately obtained a final judgment against the university. 2021 WL 257059, at *8. In joining the "many other courts finding that a delay in education is not irreparable harm," the court provided a detailed footnote collecting cases nationally where federal courts have reached the same conclusion. *Id*. at *8 n.1

13

> The court concludes that the harms Montague alleges are quantifiable and can be adequately remedied by money damages. If Montague prevails on the merits of the underlying claims and he is reinstated to Yale, he will have suffered a delay in his education, analogous to a suspension, which can be remedied through monetary compensation. *See Pierre v. University of Dayton*, 143 F. Supp. 3d 703, 714 (S.D. Ohio 2015) ("Moreover, courts have also held that a suspension is not irreparable."); *Howe v. Pennsylvania State University – Harrisburg*, No. 1:16-0102, [2016 WL 393717, at *6] (M.D. Pa. Feb. 2, 2016) ("[T]he court finds that even if the plaintiff would experience a delay as a result of his suspension, this would not constitute irreparable harm which would not be compensated through monetary damages in the future, if warranted."). If Montague is in fact reinstated, he could potentially recover monetary damages for the wrongly imposed "suspension" time period.

C.A. No. 3:16-cv-00885, 2017 WL 4942772, at *3-4 (D. Conn. Mar. 8, 2017).

In the rare cases where a court has entered preliminary injunctive relief reinstating a suspended student, the justifying circumstances were substantially compelling. For example, in *Doe v. Middlebury Coll.*, No. 1:15-cv-192, 2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2016), the plaintiff, who was entering his final year at the college, showed irreparable harm because he had a confirmed employment position to begin immediately after his graduation, expressly contingent upon his successful completion of his degree at the college. Further, the alleged sexual misconduct occurred during a study abroad program hosted by another institution, which found under its policies that the plaintiff did not engage in the alleged misconduct. *Id*. at *1. But, after the host school's finding of non-responsibility, Middlebury undertook its separate subsequent *de novo* investigation and determination, which was not authorized by its policies pertaining to study abroad programs and agreements with Plaintiff as part of the study abroad program that participants would be subject to the policies and discipline of the host school. *Id*. at *3. The college sought to re-investigate a case in which the plaintiff had already been exonerated, notwithstanding that the college's policy did not allow for a second investigation. *Id*. This breach

14

of policy compelled the court to find that the plaintiff had made a substantial showing of his likelihood of success on the merits and irreparable harm. *Id*.

Similarly, in *Doe v. Penn. St. Univ.*, 276 F. Supp. 3d 300, 302 (E.D. Pa. 2017), the plaintiff was a student enrolled in an eight-year, joint undergraduate/medical school program between Penn State University and the Sidney Kimmel Medical College at Thomas Jefferson University. Penn State sought to impose a suspension for "*as long as [the plaintiff] is a participant in the [dual degree] program.*" *Id*. at 314 (italics in original). The court found irreparable harm because "[t]his suspension from the program would presumably last for another six years," not just his remaining two years at the undergraduate institution but also four subsequent years at the program's medical school if it adopted the suspension decision. *Id*. Also, the plaintiff's long suspension effectively barred him from ever enrolling in any medical school. *Id*.

The students in the *Middlebury College* and *Penn State University* cases faced clearly specified irreparable and imminent educational and professional harms, compared to what Plaintiff has pled here generally. Plaintiff pleads only that he will not be able to play his varsity sport during the Spring 2022 semester, that he will not graduate in May 2022, and that he "may" lose unspecified employment this summer. Verf. Compl. at ¶ 111. His general assertions, including a speculative assumption about a possible loss of summer employment, do not satisfy his heavy burden to present "substantial proof" to justify the "extraordinary and drastic" remedy of a preliminary injunction. *Marzurek*, 520 U.S. at 972; *see also In re Rare Coin Galleries of Am., Inc.*, 862 F.2d 896, 902 (1st Cir. 1988) ("Speculation or unsubstantiated fears of what may happen in the future cannot provide the basis for a preliminary injunction").[3]

---

[3] Plaintiff has not specified whether he must or intends to disclose to his prospective summer employer or any future employers that a Rhode Island state court has entered a final judgment restraining him from interacting with Jane Roe. ECF Doc. No. 7-2 (filed under seal).

15

### B.      Plaintiff's desire to play a varsity sport does not satisfy a showing of irreparable harm.

In seeking a preliminary injunction, Plaintiff wishes to play a varsity sport this season. Also, he apparently hopes to participate in collegiate athletics elsewhere next academic year. The Court should not limit the University's institutional authority to decide whether Plaintiff may participate on a Brown varsity team. Plaintiff's personal desire to be a collegiate athlete (whether at Brown now or elsewhere in the future) is insufficient to demonstrate irreparable harm.

In *Doe v. Vassar College*, No. 19-cv-9601 (NSR), 2019 WL 6222918 (S.D.N.Y. Nov. 21, 2019), the court denied a preliminary injunction motion filed by a senior undergraduate student, who was suspended for one semester and sought his reinstatement in order to participate in a varsity sport and graduate at the end of the academic year. The plaintiff claimed that, if the court did not lift his suspension, he would "forever lose his ability to play college soccer and will be forced, next Fall, to decide whether to return to school to obtain a degree and forfeit an opportunity to play soccer professionally, or elect to pursue his professional soccer ambitions and lose the ability to obtain a college degree for the foreseeable future and all the opportunities which accompany having obtained a degree." *Id*. at *15. The Court held that "the harm that Plaintiff will suffer from suspension of a single semester at the beginning of his senior year is not irreparable." *Id*. at *16.[4] "[T]he harms a plaintiff might suffer from a delay in graduation are

---

[4]   *Vassar College* cited several rulings in finding no irreparable harm. *Montague*, 2017 WL 4942772, at *4; *Silman v. Utica Coll.*, No. 6:14-CV-0432, 2015 WL 365670, at *2 n.2 (N.D.N.Y. Jan. 27, 2015) (plaintiff who was expelled mid-semester did not establish irreparable harm); *Pierre v. Univ. of Dayton*, 143 F. Supp. 3d 703, 714 (S.D. Ohio 2015) ("[C]ourts have also held that a suspension from school is not irreparable.") (citation omitted) (S.D. Ind. Sept. 13, 2011)); *Mahmood v. Nat'l Bd. of Med. Examiners*, No. 12-cv-1544, 2012 U.S. Dist. LEXIS 86837, 2012 WL 2368462, at *5 (E.D. Penn. June 21, 2012) (three-year suspension from medical school did not constitute irreparable harm).

16

quantifiable and can be adequately remedied by money damages, should the plaintiff prevail on the merits of his case." *Id.* (citation omitted).[5]

In sum, Plaintiff has not proffered any evidence of an unconditional right to participate on a Brown varsity athletic team, especially when a properly conducted threat assessment has determined that he should be subject to an interim suspension. In a recent ruling (albeit in a different context than the facts of this case), the Court declined to enter a preliminary injunction sought by Brown varsity squash players, who challenged the University's decision to transition squash to club status and claimed that they had a four-year promise that they would be able to play varsity squash at Brown. *Sterman v. Brown Univ.*, 513 F. Supp. 3d 243, 253-57 (D.R.I. 2021). In finding no showing of irreparable harm, the Court held that the plaintiffs did not show how their inability to participate in a varsity sport at Brown would result in specified future harms. *Id.* at 256-57. Plaintiff has similarly failed to present any such evidence.

### C. Plaintiff seeks monetary damages, so he has an adequate remedy at law.

In his prayer for relief, Plaintiff seeks that the Court "award him damages for breach of contract in an amount exceeding $75,000.00, to be proven at trial." Where monetary damages are sought and available to be recovered if the plaintiff prevails on the merits, courts are generally unlikely to find the requisite irreparable harm. *See, e.g., Doe v. Amherst Coll.*, Civ. A. No. 14-cv-30114, 2014 WL 12597613, at *3 (D. Mass. July 28, 2014) ("The Court understands that the College's decision to withhold plaintiff's diploma may make it more difficult for plaintiff to find

---

[5] In *Vassar College*, the plaintiff claimed that he will be labeled a sex offender and will have to explain his suspension to employers or graduate schools. The Court rejected this contention of alleged irreparable harm because the record of the plaintiff's suspension was protected from disclosure without his consent by the Family and Educational Rights and Privacy Act. 2019 WL 6222918, at *6 (citation omitted).

17

employment, but the harm of lost wages is routinely compensated with monetary awards and, therefore, is not irreparable.").

### III. The balancing of the harms and public interest disfavor the entry of a preliminary injunction.

Any request for an injunction presents "a matter of equitable discretion," with "the balance of equities and consideration of public interest . . . pertinent in assessing the propriety of any injunctive relief, preliminary or permanent." *Winter*, 555 U.S. at 32. Brown has undertaken its threat assessment review consistent with its policies and procedures and exercising its proper authority. Adhering to its limited role in a case of this nature, the Court should exercise restraint and refrain from intervening as a "super-appeals" court to review Plaintiff's disagreement with Brown's threat assessment determination. *Doe*, 210 F. Supp. 3d at 313, 336.

The denial of pre-trial injunctive relief will not deprive Plaintiff of his later day in court, if he seeks to challenge Brown's disciplinary process against him including the final determination. To the extent that Plaintiff's academic and athletic pursuits may be delayed, he will be able to seek monetary damages, if he can prove at trial any breach of his educational contract. In the meantime, Brown should be allowed to proceed with its process in accordance with its stated policies and procedures, just as the University has done to date and will continue in its resolution of Plaintiff's case.

## CONCLUSION

For the foregoing reasons, Brown respectfully requests that the Court deny Plaintiff's motion seeking injunctive relief in its entirety.

BROWN UNIVERSITY

By its Attorney,

/s/ Steven M. Richard
Steven M. Richard (#4403)
Nixon Peabody LLP
One Citizens Plaza, Suite 500
Providence, RI 02903
Tel: 401-454-1020
Fax: 401-454-1030
srichard@nixonpeabody.com

Dated: January 12, 2022

CERTIFICATE OF SERVICE

    I certify that, on the 12th day of January, 2022, I filed and served this memorandum of law via the Court's CM/ECF system.      .

/s/ Steven M. Richard